*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KEVIN ROBERT SMITH,

        Defendant-Appellant.

UNPUBLISHED
March 19, 2020

No. 334692
Ingham Circuit Court
LC No. 15-001023-FC

## ON REMAND

Before: CAMERON, P.J., and METER and BORRELLO, JJ.

PER CURIAM.

This case returns to this Court on remand[1] from our Supreme Court for reconsideration of our prior judgment in light of *People v Harbison*, 504 Mich 230; 934 NW2d 693 (2019). In our prior opinion, in a split decision, we affirmed defendant's convictions over defendant's objection that his counsel was constitutionally ineffective for failing to object to an expert's opinion testimony at trial. Finding nothing in *Harbinson* which would cause us to depart from our prior conclusion, we again affirm defendant's convictions.

## I. BACKGROUND

This case concerns allegations that defendant sexually assaulted his minor cousins, DG and KG. DG testified that defendant digitally penetrated her vagina when she was about 5 years old; grabbed her breasts and digitally penetrated her vagina when she was about 12 years old; forced her to manipulate his penis on one occasion when she was between the ages of 11 and 14 years old; and penetrated her vagina with the handle of a screwdriver when she was about 13 years old, among other instances of impropriety. KG testified to similar instances of assault or impropriety.

---

[1] *People v Smith*, ___ Mich ___; 934 NW2d 213 (2019).

At trial, the trial court admitted the testimony of Dr. Stephen Guertin, who was qualified as an expert in child sexual abuse.

Dr. Guertin testified that he saw DG and KG for evaluations in February 2015. By that time, both girls were "postpubertal" and informed him that they were sexually active; the girls had also informed Dr. Guertin of their sexual contact with defendant in detail. Dr. Guertin stated that this history was necessary to his treatment of DG and KG. Dr. Guertin testified that, during his examination of the girls, he discovered two deep notches on DG's hymen and one deep notch on KG's hymen. Dr. Guertin opined that injuries to the hymen could be consistent with sexual assault or volitional sexual contact and that, when a person is otherwise sexually active, "you can't necessarily say [that the injury] was from one or the other."

Dr. Guertin continued, however, to describe the difference between the "prepubertal" and "postpubertal" hymen. Dr. Guertin testified that the opening of the hymen in a prepubertal child is usually less than 10.5 millimeters in diameter; in the postpubertal period, the opening is typically between 12 and 25 millimeters. For reference, Dr. Guertin explained that an average finger is 15 to 16 millimeters in diameter and an erect penis is roughly 36 millimeters in diameter. Dr. Guertin testified that in the prepubertal period, the hymen is thinner, "more fragile," and "won't stretch"; in the postpubertal period, "the hymen is now thicker, but much more stretchable." According to Dr. Guertin, injuries to the hymen typically occur because of some form of penetration and "the potential for injury is always higher in the pre-pubertal period." Dr. Guertin explained that "once a hymen is torn, especially if it's torn all the way to the base, there is a high probability that it won't reunite. This is especially true in the pre-pubertal period."

Dr. Guertin reiterated several times that an injury to the hymen could occur during either period and by either sexual assault or volitional sexual contact, but that injury was most likely during the pre-pubertal period. On balance, Dr. Guertin opined that both girls had been sexually assaulted:

> *Q*. Now. Is it—when you have a history of sexual abuse in this way, you indicated a clear history and a strong history, I think, for each girl, then you find those particular injuries. And in Kim's case she specifically says there is no accidental injury. What, if any, conclusion do you draw from that?
>
> *A*. The conclusion that you can—
>
> *Q*. Or diagnosis, I should say.
>
> *A*. There are a number of conclusions you can draw. And they are in the assessment. But the first one is a child gives a history of recurrent forms of sexual molestation. She is describing penetrated molestation on more than one occasion. She is not only describing discomfort, but describes bleeding associated with at least one of these episodes.
>
> When you examine her, you find that she has two tears in her hymen. Tears in the hymen are completely consistent with what she has said about episodes of penetrative abuse. By the way, they are also consistent with a history of recurrent volitional sexual intercourse.

-2-

The second child gives you a history of penetrative events, gives you a history of bleeding as well as pain. She has a single tear on her hymen. That tear in her hymen is completely consistent with what she has said.

She also admits to volitional sexual intercourse. So it could be from that, too.

But in terms of making a diagnosis of sexual abuse, if you have a clear or detailed history, I cannot tell you that it is the truth. I'm telling you that it is clear or strong or detailed. And you have physical findings that would be consistent with what is in that history. I believe it is valid to conclude that the child was sexually molested. In this case both of them.

*Q.* Again, that's based on your—it's consistent—with the history is consistent with their findings?

*A.* Right. The diagnostic process is history. Sometimes that's all you have—

*Q.* Sure.

*A.* —physical examination and any laboratory studies that you might do. And in this particular case the diagnostic process would lead you to a conclusion, that led me to a conclusion, frankly, that they have been molested.

*Q.* All right. And you weren't here, you can't know that for sure. You're just basing this on a procedure, correct?

*A.* Right. I can't know that for sure.[2]

The trial court gave the jury instructions regarding Dr. Guertin's testimony. Those instructions provided, in pertinent part:

You've heard testimony from a witness, Doctor Stephen Guertin, who is giving you his opinion as an expert in the field of child sexual abuse. Experts are allowed to give opinions in court about matters they are experts on. However, you do not have to believe an expert's opinion. Instead, you should decide whether you believe it and how important you think it is.

\* \* \*

You heard Doctor Guertin render a conclusion that Deborah Green and Kimberly Green were sexually abused. That evidence cannot be used to show that the crimes charged were committed, or that the Defendant committed them, nor can

---

[2] This exchange occurred during the prosecutor's redirect examination of Dr. Guertin.

it be considered an opinion by Doctor Guertin that Deborah Green and Kimberly Green are telling the truth.

You, as jurors, are the sole judges of the facts and the credibility of the witnesses. And you should base your decision on all the evidence presented in the case.

The jury found defendant guilty of one count of first-degree criminal sexual conduct (CSC I), MCL 750.520b, for digitally penetrating DG and one count of second-degree criminal sexual conduct (CSC II), MCL 750.520c, for touching DG's breasts. The jury acquitted defendant of a second count of CSC I related to an allegation that defendant penetrated KG with a hand tool. The jury was unable to reach a verdict on a second count of CSC II related to an allegation that defendant forced DG to touch his penis. After trial, this second count of CSC II was dismissed on the prosecution's motion for *nolle prosequi*.

## II. ANALYSIS

In the original appeal, defendant raised several alleged errors, only one of which is implicated by our Supreme Court's opinion in *Harbison*.[3] In the prior appeal, defendant argued that he was unconstitutionally denied the effective assistance of trial counsel because trial counsel failed to object to Dr. Guertin's opinion testimony. *People v Smith*, unpublished opinion of the Court of Appeals, issued August 14, 2018 (Docket No. 334692) p 6-9. In affirming defendant's convictions, we rejected this argument on two grounds. First, we concluded that "[h]ad the jurors unquestioningly accepted Dr. Guertin's testimony, they would have found defendant guilty of all four counts; instead, the jurors followed their instructions and only convicted defendant on the two counts for which they found sufficient evidence." *Id*. at 9. In this regard, we concluded that the admission of the evidence did not affect the outcome of defendant's trial. *Id*. Additionally, in two footnotes, we concluded that Dr. Guertin did not improperly opine on the ultimate issues in the case because "Dr. Guertin's opinions were based in part on his physical examinations." *Id.* at 9 n 10; 17 n 15.

In *Harbison*, our Supreme Court held "that examining physicians cannot testify that a complainant has been sexually assaulted or has been diagnosed with sexual abuse without physical evidence that corroborates the complainant's account of sexual assault or abuse because such testimony vouches for the complainant's veracity and improperly interferes with the role of the jury." *People v Thorpe*, 504 Mich 230, 235; 934 NW2d 693 (2010).[4] See also *People v Smith*, 425 Mich 98, 112-115; 387 NW2d 814 (1986) (comparing *People v Smith* with its companion case *People v Mays*). In this case, Dr. Guertin testified that it was his opinion that DG and KG had been sexually assaulted based on the fact that both girls experienced hymen tears, which was consistent with them informing him that they had been sexually assaulted before puberty. While

---

[3] Our Supreme Court's remand order vacates our prior judgment, but not our prior opinion. Accordingly, we will only address our prior opinion to the extent that it is implicated by *Harbinson*, leaving our analysis and conclusions intact on the majority of the issues defendant raised on appeal.

[4] *Harbison* is the companion case in *Thorpe*.

Dr. Guertin did testify that a hymen tear may be consistent with assaultive or volitional sexual contact, this is not a case where the expert's opinion was based on his credibility determinations. Rather, Dr. Guertin testified that a hymen tear is much more likely in the pre-pubertal period when the hymen opening is relatively small and the hymen is more rigid and susceptible to injury. Indeed, according to Dr. Guertin, permanent injury to the hymen, such as the deep tears that occurred in this case, is more likely to occur during the pre-pubertal stage and this type of prepubertal tear is less likely to fully heal. Accordingly, because the physical evidence in this case supported Dr. Guertin's opinion that the girls were sexually assaulted, we conclude that Dr. Guertin's opinion was admissible under *Smith* and *Harbison*.

Affirmed.

/s/ Thomas C. Cameron
/s/ Patrick M. Meter